FILED

2012 Jun-20  AM 11:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TRACI E. BULLOCK,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:11-cv-2593-AKK** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Traci E. Bullock ("Bullock") brings this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA").  Doc. 8.  This court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is supported by substantial evidence.  Therefore, for the reasons elaborated herein, the Court will **AFFIRM** the decision denying benefits.

## I.  Procedural History

Bullock filed her application for Title II disability insurance benefits

("DIB") and Title XVI Supplemental Security Income ("SSI") on October 29, 2007, alleging a disability onset date of October 12, 2007, due to depression and chronic pulmonary insufficiency.  (R. 54-57).  After the SSA denied her applications on December 28, 2007, (R. 58-62), Bullock requested a hearing on February 15, 2008, (R. 65-66), which she received on October 6, 2009, (R. 26-53).  At the time of the hearing, Bullock was 43 years old with a high school education and some post-secondary education.  (R. 23, 30).  Her past relevant work included sedentary and skilled work as an administrative assistant and as a legal secretary.  *Id.*  Bullock had not engaged in substantial gainful activity since October 12, 2007.  (R. 13).

The ALJ denied Bullock's claims on December 14, 2009, (R. 25), which became the final decision of the Commissioner when the Appeals Council refused to grant review on May 25, 2011, (R. 1-4).  Bullock then filed this action on July 15, 2011, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Doc. 1; doc. 8.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988);

*Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence." *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the court must affirm the Commissioner's factual findings even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

### III. Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)    whether the claimant is currently unemployed;

(2)    whether the claimant has a severe impairment;

(3)    whether the impairment meets or equals one listed by the Secretary;

(4)    whether the claimant is unable to perform his or her past work; and

(5)    whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other

than step three, leads to a determination of 'not disabled.'" *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV.  The ALJ's Decision

The court turns now to the ALJ's decision to ascertain whether Bullock is correct that the ALJ committed reversible error.  In that regard, the court notes that, performing the five step analysis, the ALJ initially determined that Bullock had not engaged in substantial gainful activity since her alleged onset date, and therefore met Step One.  (R. 13).  Next, the ALJ found that Bullock suffered from the following severe impairments: depression, anxiety, obesity, and chronic obstructive pulmonary disease ("COPD"), *id.*, but that Bullock's "gastroesophageal reflux disease (GERD), asthma, and history of alcohol abuse, in remission by self-report, are deemed to be non-severe impairments," (R. 14).  The ALJ then proceeded to the next step and found that Bullock failed to satisfy Step Three because she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  (R. 18).  Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four, where he

determined that:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant would need a sit and stand type of job where she can sit for 30 minutes at a time and stand for 5 minutes at a time throughout an 8-hour workday. The claimant can occasionally, up to one-third of the workday, climb ramps and stairs, balance, stoop, kneel, or crouch. The claimant cannot perform any crawling or work on ladders, ropes, scaffolds, or be around unprotected heights or hazardous machinery. The claimant should avoid concentrated exposure to extreme cold and heat, wetness and humidity, fumes, odors, dust, gases, and poor ventilation. The claimant can understand, remember, and carry out instructions of a short, simple nature for at least a 2-hour period across an 8-hour workday. Claimant should have minimal contact with the general public, and any supervision should be non-confrontational, tactful, and non-threatening. Any changes in the workplace should be minimal, and due to the claimant's anxiety difficulties, she is limited to performing low stress jobs involving making only simple work-related decisions.

(R. 19). Moreover, in light of Bullock's RFC, the ALJ held that Bullock is "unable to perform any past relevant work." (R. 23). Lastly, in Step Five, the ALJ considered Bullock's age, education, work experience, and RFC, and determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* Because the ALJ answered Step Five in the negative, the ALJ determined that Bullock "has not been under a disability, as defined in the Social Security Act, from October 12, 2007 through the date of this decision." (R. 24). *See also McDaniel*, 800 F.2d at 1030.

## V.  Analysis

The court turns now to Bullock's contentions that (1) the Appeals Council failed to properly evaluate the entire record – including the Alabama Department of Rehabilitation Services letter dated October 13, 2010, and (2) the ALJ failed to "properly consider the[] impairments in combination pursuant to 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii)."  Doc. 8, at 6-10.  Based on its review of the record, the court finds no reversible error.

A.    *Alabama Department of Rehabilitation Services Letter*

Bullock's appeal of the ALJ decision to the Appeals Council included a brief in support and an October 13, 2010 letter from the Alabama Department of Rehabilitation Services.  (R. 1-4).  The letter, signed by Marilyn McBryde, an Independence Through Employment Counselor, provided:

> Enclosed are a Vocational evaluation and a Psychological evaluation on the above-named individual who has been encouraged to apply for Social Security benefits.  Ms. Bullock has the following diagnosis: Mild Mental Retardation, Bi-Polar Disorder, Major Depressive Disorder, Borderline Personality Disorder, Anxiety Disorder, COPD, and Asthma.  The conditions also result in an ongoing use of Psychotropic medications, medication impairment, and emotional instability.  As a result, Rehabilitation Services is unable to put her to work.

(R. 387).  Although the Appeals Council specifically provided that "we considered the reasons you disagree with the decision and the additional evidence listed on

the enclosed Order of Appeals Council," (R. 1), *see also* (R. 4) (Order of Appeals
Council listing "Letter from the Alabama Department of Rehabilitation Services"),
Bullock maintains that "the Appeals Council should have at least properly
reviewed [this] evidence to determine if it warranted remand." Doc. 8, at 8. More
specifically, Bullock argues that, "[t]hough coming ten months after the ALJ's
decision, the opinion from Ms. McBryde is significant because it comes from an
unbiased source at a state agency and relates to the period before the ALJ's
decision." *Id.* The court disagrees that this letter pertains to the condition of
Bullock's impairments prior to the ALJ decision. *See* doc. 9, at 9-10.

The Federal Regulations provide that "[i]f new and material evidence is
submitted, the Appeals Council shall consider the additional evidence only where
it relates to the period on or before the date of the administrative law judge hearing
decision." 20 C.F.R. § 404.970(b); *Smith v. Social Security Admin.*, 272 F. App'x
789, 800 (11th Cir. 2008). Unfortunately for Bullock, the Rehabilitation Services
letter offers no indication that it pertains to Bullock's impairments on or before
December 14, 2009 (date of the ALJ decision). (R. 25). Rather, it appears that the
letter describes Bullock's current condition on October 13, 2010—ten months
*after* the ALJ decision. (R. 387). Accordingly, this letter is improper new
evidence under 20 C.F.R. § 404.970(b), and as such, remand is not warranted

based on the substance of the letter.

B.    *Impairments in Combination*

      Bullock also incorrectly contends that, while the "ALJ recites the evidence documenting these impairments [depression, anxiety, obesity, and COPD], . . . nowhere in his decision does he properly consider these impairments in combination."  Doc. 8, at 6.  To the contrary, the ALJ rigorously analyzed the objective medical evidence for each impairment and concluded that these impairments "*together* are 'severe' within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (R. 18) (emphasis added).  Furthermore, in determining Bullock's RFC, the ALJ stated that he "considered *all symptoms* and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (R. 19) (emphasis added).  And indeed, the substantial evidence supports the ALJ's conclusion.  *See Martin*, 849 F.2d at 1529.

      As it relates to depression and anxiety, the ALJ found that, "although the claimant has received some treatment for these alleged impairments, which would normally weight somewhat in the claimant's favor, the record also reveals that the treatment has been essentially routine and/or conservative in nature and has

generally been successful in controlling symptoms." (R. 20-21). The substantial

evidence supports this conclusion. Specifically, in the "Daily Activities

Questionnaire," Bullock reports that "I rarely socialize with outsiders because I

want to cry all the time because I feel helpless," (R. 132); "I don't have an urge to

socialize because I am severely depressed and can't hold long conversations for

shortness of breath," *id.*; and "I don't have the energy or will to play [cards]

anymore. I have not been taking my anti-depressants because of the numerous

other meds I'm taking. Because of this, I am deeply depressed and find it difficult

to get out of bed or socialize with anyone because I cry all the time and my body

aches and I can't hardly breathe," *id.* However, the December 17, 2007

psychological evaluation by Dr. Jon Rogers provided that "Bullock reported

having received treatment by a mental health professional, beginning in 1987 . . .

because her father was abusive and her parents divorced. *She was seen most*

*recently in November, 2004.* She was prescribed Wellbutrin XL in the past." (R.

259) (emphasis added). Indeed, Dr. Rogers found that Bullock's "[e]ffort and

motivation during the evaluation were satisfactory," "[t]he extent of her mental

impairment is moderate," and Bullock "should be able to perform most activities

of daily living." (R. 264). Dr. Rogers also stated that Bullock's "ability to

understand, remember, and carry out instructions and respond appropriately to

supervision, co-workers, and work pressures in a work setting would be moderately impaired." (R. 265).

Bullock did not seek mental health treatment again until eleven months later when, in November 2008, Bullock begin therapy sessions at the Madison County Mental Health Center. (R. 367). Bullock presented a "sad" affect/mood on November 3, 2008 but "normal" orientation and denied suicidal or homicidal ideation. *Id.* Bullock also reported isolation, decreased energy, and anxiety, but as it relates to the anxiety, Bullock stated the she was able to "overcome [it] after 1 year." *Id.* On November 17, 2008, Bullock again complained of depression but demonstrated an "ok" affect with goal direction and no disturbed mood, delusions, hallucinations, or homicidal/suicidal ideation. (R. 370). Similarly, on January 6, 2009, Bullock requested depression medication from the Madison County Mental Health Center, but presented no disturbed mood, delusions, hallucinations, or homicidal/suicidal ideation and had an "ok" affect with goal direction. (R. 368).

On January 23, 2009, Bullock presented to her mental health physician a sad affect/mood with ongoing isolation and ongoing challenges coping with limitations of medical issues. Bullock also reported experience of "death wishes month ago 'actually made small cut on hand.' Denied experiencing [suicidal ideation] at this time." (R. 366). However, the treating physician further provided

that Bullock "was responsive to intervention process.  She demonstrated improvement in mood and motivated to follow through with recommendations. Agreed to follow through with safety plan as needed . . . . [Bullock] reported improvement with [symptoms] of anxiety since taking Buspar.  Reported ability to travel on Parkway today [without] anxiety."  *Id.*  Bullock next presented to the Mental Health Center on August 8, 2009, with mood symptoms, anxiety symptoms, and sleep disturbance—Bullock denied auditory/visual hallucinations, paranoia, delusions, and suicidal/homicidal ideation.  (R. 383).  Dr. Alan Piha diagnosed Bullock with major depression but provided that Bullock demonstrated a casual/alert appearance, euthymic mood—although irritable affect—, organized thought processes, and rational judgment.  *Id.*  Bullock provided "medication management" as her chief complaint for visiting the Mental Health Center.  *Id.* Finally, the medical record establishes that Bullock last visited Dr. Piha in the Mental Health Center on September 30, 2009, again for "medication management."  (R. 380).  Bullock denied anxiety symptoms as well as auditory/visual hallucinations, paranoia, delusions, and suicidal/homicidal ideation, but endorsed mood symptoms and presented a dysthymic mood with a sad affect.  *Id.*  Dr. Piha continued Bullock's Buspar medication and also prescribed Celexa.

Thus, the medical evidence certainly reveals that Bullock suffers from depression and perhaps, to a lesser degree, anxiety.  However, the ALJ comprehensively reviewed Bullock's psychiatric medical records, (R. 20-21), and the substantial evidence also supports the ALJ's finding that Bullock only received conservative treatment for these impairments.

Furthermore, the ALJ comprehensively addressed Bullock's COPD-related medical records and concluded that the treatment for this impairment "has generally been successful in controlling her symptoms."  (R. 21-22).  The objective medical evidence supports this finding regarding the nature and extent of Bullock's COPD.  First, the court notes that Bullock admitted at the ALJ hearing that, although she is trying to quit, she still smokes a pack of cigarettes per week. (R. 44).  Moreover, on September 18, 2007, Bullock visited the Huntsville Hospital's emergency room complaining of "chest pain that is sharp [in] sensation, is aggravated by certain movements and by deep breathing."  (R. 171).  Dr. Phillip L. Lacy's physical examination for this emergency room visit revealed that "the Emergency Room EKG's have been normal.  Two sets of cardiac enzymes has[sic] been negative.  CT angio is negative.  She is very tender about her left breast . . . . Lungs are clear bilaterally.  Heart is regular rate and rhythm without murmur or gallop.  Chest wall is diffusely tender about the left breast."  (R. 171-194).  By

5:05 P.M. the hospital's progress notes establish an "improved" and "good" condition, and the hospital released Bullock.  (R. 176).

Bullock again presented at the Huntsville Hospital's emergency room on October 16, 2007 asserting that "[f]ive days back she got a flu or cold infection from her daughter who is in the 5th grade and has been coughing greenish yellowish sputum and having a severe headache.  The patient is having stuffiness in the head and sinuses and postnasal sinus drainage and coughing frequently so that she hurts in the chest on both sides."  (R. 201).  Dr. Devi P. Misra discharged Bullock three days later on October 19, 2007 and diagnosed Bullock with "acute exacerbation of [COPD]; status asthmaticus; acute exacerbation of bronchitis; and chronic, recurrent sinusitis."  (R. 200).  Dr. Misra treated Bullock with IV antibiotics, IV steroids, and aerosol treatments, but discharged Bullock "on her regular medications to be followed by her primary care physician."  *Id.*  Dr. Misra also advised Bullock "to rest for 10 days before [going] back to work."  *Id.* Furthermore, on this October 16, 2007 emergency room visit, Radiologist Robert Ankenhead provided that Bullock's "lungs are clear.  No pneumothorax or pleural effusion is seen.  The heart size is normal.  The pulmonary vascularity, trachea and bronchi are unremarkable . . . . No acute pulmonary or pleural disease is seen."

(R. 203).[1]

On March 11, 2008, Bullock visited the Central North Alabama Health Services for asthma exacerbation, GERD, and COPD.  (R. 297-298).  She subsequently presented to the Huntsville Hospital emergency room on the same day with COPD exacerbation.  (R. 341-343).  Dr. Clement Okinedo discharged Bullock on March 14, 2008, and provided in the "Hospital Course and Treatment" notes that Bullock "was placed on intravenous steroids, nebulizer treatments and also antibiotics.  She did well.  She remained stable.  She had a CT scan of the chest done which was negative."  (R. 341).  Indeed, the March 11, 2008 hospital tests reveal that "the heart and the pulmonary vessels are normal in size.  Lungs are free of acute process . . . . No acute findings."  (R. 343).  Similarly, the March 14, 2008 tests provide that "the lungs are well expanded and clear.  The airway is well maintained.  The hilar and mediastinal structures show no abnormalities.

---

[1] The court notes that Bullock visited Dr. Misra again on October 29, 2007, but Dr. Misra's physical exam on this date revealed that Bullock "is alert and oriented and in no major acute distress.  Lungs are clear and wheeze-free.  Cardiac examination is normal with no murmur, rub, or gallop."  (R. 253).  Dr. Misra also stated in the Progress Notes under "Plan" that Bullock "will have complete pulmonary testing.  She will file for disability because she cannot function in the work-place."  *Id.*  It is unclear whether, in this statement, Dr. Misra refers to Bullock's intended "plan," or a purported medical assessment of disability.  Based on Dr. Misra's own treatment notes about Bullock's symptoms and how Bullock can return to work, (R. 253, 200), the court reasonably infers the former.  However, even if Dr. Misra concluded that Bullock "cannot function in the work-place," this opinion is not supported by the objective medical evidence or Dr. Misra's own treatment notes.  *See Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984) (per curiam) ("[T]he ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.").

Chest wall is unremarkable.  The adrenal glands are not enlarged." (R. 342).  As such, the clinical impression stated: "normal study."  *Id.*

From May to September 2008, Bullock visited the Sparkman Medical Clinic in Huntsville for various reasons including certain pulmonary-related symptoms. (R. 309-316, 355-362).  More specifically, Bullock complained of pain in the lungs and chest and coughing blood on May 22, 2008, (R. 316), a need to refill and change prescription medications on June 11, 2008, (R. 314), COPD on June 2, 2008, (R. 312), coughing on September 8, 2008, (R. 309), and a congested chest on September 29, 2008, (R. 355).  Additionally, Bullock went to the Huntsville Hospital emergency room again on October 12, 2008, complaining of pain in the right flank.  (R. 33-340).  However, as it relates to Bullock's respiratory system, she presented "no wheezing, no rales, no rhonchi, no coarseness, [negative for] accessory muscle use, [l]ung sounds present bilateral, lungs clear." (R. 333).  Dr. William Langston discharged Bullock within five hours and provided that she could return to work/school in 1-2 days.  (R. 335).  Thus, similar to depression and anxiety, Bullock suffers from pulmonary-related symptoms; however, the objective medical evidence supports the ALJ's decision regarding the disabling qualities of these symptoms.

The ALJ also found that Bullock suffered from the impairment of obesity,

but he determined that "the record is inconsistent with any physician stating the claimant's weight significantly limits or has resulted in impaired functioning . . . the record is inconsistent with showing that this impairment has impacted on her musculoskeletal system or general health as to cause her treating physician to diagnose her with impairments secondary to or in combination with obesity." (R. 22). Indeed, the objective medical evidence offers little, if any, indication of functioning concerns related to obesity. Moreover, Bullock fails to mention obesity as an impairment in her Daily Activities Questionnaire, (R. 130-136), and the ALJ correctly maintains that, at the ALJ hearing, Bullock never alleged any functional impairment due to her weight. (R. 22, 30-49).

Finally, the ALJ properly discredited the overall alleged effect on daily functioning created by Bullock's symptoms because "[t]he claimant admitted at the time of the hearing she was currently drawing [unemployment] benefits and that each time she signed up for these benefits she had declared that she was ready, willing, and able to work and that she had looked for work but could not find anything." (R. 22, 32, 42-43). In other words, while nothing categorically precludes a claimant from receiving unemployment *and* disability benefits, the receipt of unemployment benefits requires a claimant to demonstrate that they are able to work—a position inherently contradictory to the requirements of disability

benefits.  *Cf. Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991)

(establishing that, under the "pain standard," the Secretary may discredit the

claimant's subjective allegations of pain if done so explicitly).

     In closing, Bullock correctly contends that the ALJ must consider the

combined effect of all her impairments, doc. 8, at 6 (citing *Walker v. Bowen*, 826

F.2d 996, 1001 (11th Cir. 1987); however, by exhaustively evaluating each of

Bullock's impairments—and finding the objective medical evidence establishes

that, "together," the impairments are "not severe enough to meet or medically

equal one of the impairments listed in Appendix 1, Subpart P, Regulations No.

4"—the ALJ sufficiently considered Bullock's impairments *in combination*.  *See*

(R. 18-23).  Indeed, the Eleventh Circuit in *Walker* found the ALJ in error because

he "made specific reference only to [claimant's] left ankle and obesity.  The ALJ's

findings do not mention [claimant's] arthralgias in the right knee, phlebitis in the

right arm, hypertension, gastrointestinal problems, or asthma, except to the extent

that these 'subjectiv[e] complain[t]s do not establish disabling pain.'" 826 F.2d at

1001.  Conversely, here, the ALJ discussed and analyzed each of Bullock's severe

impairments—depression, anxiety, obesity, and COPD—and reached his

conclusion based on all of these impairments.  (R. 20-23).  *See also Wilson v.*

*Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002) (citing *Jones v. Dept. of*

*Health and Human Servs.*, 941 F.2d 1529, 1533 (11th Cir.1991), for the proposition "that the following statement by an ALJ evidenced consideration of the combined effect of a claimant's impairments: while '[the claimant] has severe residuals of an injury to the left heel and multiple surgeries on that area, [the claimant does not have] an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.'") (alteration in original).

## VI.  Conclusion

Based on the foregoing, the court concludes that the ALJ's determination that Bullock is not disabled is supported by substantial evidence, and that the ALJ applied proper legal standards in reaching this determination.  Therefore, the Commissioner's final decision is **AFFIRMED**.  A separate order in accordance with the memorandum of decision will be entered.

Done the 20th day of June, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE